***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Rowell. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Rowell with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are properly denominated in the caption.
2. An employee/employer relationship as defined by N.C. Gen. Stat. §97-2(2) existed between the parties on or about February 15, 2000.
3. W.T. Humphrey, Inc. (defendant-employer) was insured for workers' compensation coverage by CNA Commercial Insurance Company on February 15, 2000.
4. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
5. All parties are properly before the Commission for hearing and the Commission has jurisdiction of the parties and the subject matter.
6. Pursuant to N.C. Gen. Stat. § 97-2, it is stipulated that employee's compensation rate is $333.09.
7. The parties stipulated into evidence as Stipulated Exhibit #1, the Pre-trial Agreement as modified and initialed by the parties.
8. The parties stipulated into evidence as Stipulated Exhibit #2, vocational Rehabilitation Records.
9. The parties stipulated into evidence as Stipulated Exhibit #3, Medical Records.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was 48 years old, with an eighth grade education, and had been unsuccessful in obtaining his GED.
2. Plaintiff has worked in the plumbing and construction industry for most of his life. Defendant-employer primarily performs commercial construction projects. Plaintiff worked for defendant-employer on several occasions and was hired most recently on June 5, 1995 as a plumber. His duties consisted of putting in pipes, measuring pipes, drilling holes, crawling under houses and occasionally climbing ladders.
3. Plaintiff was injured on February 15, 2000 while drilling holes in concrete when the drill bit stuck in the concrete causing the drill to spin around and hit his knees. Plaintiff alleges that both of his knees were injured as a result of this accident.
4. Defendants accepted as compensable plaintiff's February 15, 2000 injury by accident and the injuries which resulted to plaintiff's left knee.
5. Plaintiff presented to P. David Green, M.D. at Urgent Care of Jacksonville on February 21, 2000 complaining of swelling and pain in his left knee since his on-the-job injury on February 15, 2000. The exam of the left knee revealed healing abrasions, both laterally and medially. Dr. Green noted a contusion and abrasions to plaintiff's left knee and placed him on limited work duty, including no climbing, crawling, prolonged standing or strain or stress of the left knee. There was no mention of plaintiff's right knee or back in Dr. Green's notes.
6. Plaintiff was evaluated by Ralph J. DiFiore, M.D. at Onslow Orthopaedics, P.A. on February 23, 2000. At that time, plaintiff complained of medial pain and popping in his left knee through range of motion. Dr. DiFiore's impression was contusion of the left knee. There was no mention of plaintiff's right knee or back in any of Dr. DiFiore's notes.
7. Plaintiff returned to Dr. DiFiore on March 16, 2000 continuing to have pain in his left knee, but he was slightly improved. He also complained of his left knee locking and giving away. Dr. DiFiore diagnosed Plaintiff with chondromalacia patella of the left knee and placed him on light duty work with instructions to avoid repetitive squatting or kneeling.
8. Plaintiff also was seen by Dr. DiFiore on April 6, 2000, at which time, an MRI was scheduled for April 19, 2000. The MRI of Plaintiff's left knee revealed a large tear of the medial meniscus, more severe posteriorly.
9. Plaintiff underwent an arthroscopy of his left knee on May 25, 2000 by Dr. DiFiore. Plaintiff was examined again by Dr. DiFiore on May 30, 2000. On June 6, 2000, Dr. DiFiore rechecked Plaintiff's left knee, when he was found to be doing "quite well" with some continuing numbness. Plaintiff was restricted from climbing ladders, squatting or crawling until further notice and released to return to work on June 12, 2000.
10. Plaintiff returned to Dr. DiFiore on June 20, 2000 and reported that he was doing better and reported only mild pain and popping at times in his left knee. Plaintiff was instructed to continue working under the same restrictions.
11. Plaintiff returned to Dr. DiFiore on September 26, 2000 complaining of some catching in his knee when he starts to get up, but that the overall pain was decreasing. On November 1, 2000, Dr. DiFiore assigned a permanent partial disability rating of 20% to plaintiff's left lower extremity, due to patella femoral arthritis.
12. Plaintiff was evaluated by Noel B. Rogers, M.D. for a second opinion on January 19, 2001. In addition to informing Dr. Rogers of his left knee problems, plaintiff mentioned that he was having problems with his right knee for the first time. Dr. Rogers scheduled an MRI of his left knee and advised plaintiff to continue to work. After the MRI was performed, Dr. Rogers referred plaintiff to a Dr. William E. Garrett, Jr., a sports medicine specialist in Chapel Hill.
13. Plaintiff was examined by Dr. Garrett at UNC Hospitals on March 23, 2001. Dr. Garrett performed arthroscopic surgery to plaintiff's left knee on April 12, 2001. Plaintiff followed-up on April 17, 2001 with Dr. Garrett, who advised Plaintiff to remain out of work.
14. Dr. Garrett evaluated plaintiff on May 25, 2001. Plaintiff reported to Dr. Garrett that he thought he probably needed to stay out of work a while longer because he went back too soon last time. Therefore, Dr. Garrett kept plaintiff out of work for another two weeks and indicated that plaintiff could return to light duty work at the end of the two-week period.
15. Plaintiff returned to work on June 19, 2001. However, at times, he would leave work after two hours due to the pain in his left knee. Dr. Garrett and the rehabilitation nurse, Linda Morreale, had advised him that he should be able to do that type of work for eight hours a day.
16. Plaintiff returned to Dr. Garrett on July 27, 2001 and reported that he had been on light duty work. Plaintiff told Dr. Garrett that he felt that he was unable to return to his full performance of that work which requires climbing on ladders, crawling and other such maneuvers. Dr. Garrett indicated that plaintiff's symptoms were much more severe than his physical findings. Dr. Garrett was uncertain as to why plaintiff's left knee continued to bother him so much. Plaintiff was given the choice of a Work Hardening Program or a final rating, and he chose the Work Hardening Program.
17. Plaintiff participated in a Work Hardening Program from July 31, 2001 until September 27, 2001. A Functional Capacity Evaluation ("FCE") was performed on September 27, 2001. The FCE revealed slightly limited left knee flexion, moderate patella-femoral crepitus, and slight anterior laxity.
18. Dr. Garrett evaluated plaintiff again on October 5, 2001. Plaintiff complained of persistent burning type pain in his left knee. Plaintiff informed Dr. Garrett that he was very concerned that he would not be able to return to his prior work level of plumbing which requires ladders and crawling at times. According to Dr. Garrett's notes, the FCE was equivalent for medium work capacity which was consistent with plaintiff's plumbing job. Dr. Garrett provided plaintiff with a note which allowed him to return to work within his functional capacity with the exception that he was restricted from climbing ladders or crawling. Plaintiff indicated to Dr. Garrett that he would investigate the possibility of vocational rehabilitation and attainment of a GED.
19. Plaintiff testified that he returned to work for defendant-employer on October 9, 2001, and he was able to work 32 hours that week. Plaintiff only worked for defendant-employer 16 hours the week of October 16, 2001. Following his work week of October 16, 2001, Plaintiff never returned to work for the defendant-employer. Plaintiff took himself out of work at that time. He had not been taken out of work at that time by any doctor.
20. Plaintiff reported to Dr. Garrett unexpectedly on October 26, 2001 indicating that he had difficulty returning to work and normal activity. Plaintiff stated that he attempted to work on several occasions but had persistent pain and burning. Dr. Garrett felt that plaintiff would warrant a psychiatric and pain evaluation at a formal pain management center.
21. Plaintiff underwent a psychological examination by Dan R. Chartier, Ph.D. at Carolina Back Institute on November 14, 2001. Dr. Chartier recommended that plaintiff be referred to a comprehensive pain program.
22. Plaintiff was evaluated by Catherine A. Lawrence, D.O. at Carolina Back Institute on November 15, 2001. Plaintiff complained of bilateral knee pain, left greater than the right. He also complained of chest pain and shortness of breath. Dr. Lawrence recommended scheduling a three-point pain management program and out of work for one month. There is no mention of any back complaints or problems in any of the records from Carolina Back Institute.
23. Plaintiff participated in Carolina Back Institute's pain management program from January 14, 2002 until February 7, 2002. He was given restrictions of no lifting over 10 pounds, no crawling and no kneeling. He was given instructions to return to work on February 11, 2002. Plaintiff has not looked for another job since he was released to return to work on February 11, 2002.
24. Plaintiff was seen by Dr. Garrett on March 15, 2002. Dr. Garrett assigned a permanent partial disability rating of 15% to plaintiff's left lower extremity and stated that his restrictions remained the same. During this visit, plaintiff mentioned a previous back injury to Dr. Garrett. Dr. Garrett did not consider this reference to a previous back injury significant enough to treat or to refer plaintiff to a back specialist. However, this reference to his back is the first time plaintiff mentioned a problem about his back to any medical provider after February 15, 2000.
25. On August 13, 2002, Michael Fryar ("Fryar") transmitted a facsimile letter to plaintiff's counsel requesting that they contact him to facilitate an initial vocational rehabilitation appointment. Fryar is a Senior Rehabilitation Specialist with Intracorp. He handles vocational and medical case management. He is also a Qualified Rehabilitation Professional. Fryar received no response from this initial communication.
26. On September 6, 2002, Fryar transmitted another facsimile letter to plaintiff's counsel indicating that he would be contacting plaintiff directly since no response had been received from his August 13, 2002 letter.
27. Plaintiff was seen by John N. Oh, M.D. on September 26, 2002. Plaintiff complained to Dr. Oh of possibly twisting his back during his on-the-job injury on February 15, 2000. He also complained of persistent left knee pain. Dr. Oh recommended chronic pain management.
28. After several attempts, Fryar was successful in speaking with plaintiff and scheduling the initial vocational appointment for October 7, 2002. Plaintiff did not show up for his initial meeting on October 7, 2002. Plaintiff never provided Fryar with any reason for not showing up.
29. An MRI of plaintiff's low back was taken on October 11, 2002. The MRI revealed no central or neural foraminal stenosis at any level and degenerative disc disease space narrowing at L2-L3, mild loss of signal and height of disc space at L3-L4. Plaintiff returned to Dr. Oh on October 24, 2002. Dr. Oh determined that the MRI showed no obvious findings. He again recommended chronic pain management.
30. On November 4, 2002, Fryar sent plaintiff a letter requesting that he contact him so that they could reschedule the initial appointment. No response was received from plaintiff. Plaintiff's counsel finally contacted Fryar to reschedule the appointment.
31. Fryar attempted to contact plaintiff to confirm the December 30, 2002 appointment. However, he was unsuccessful and he canceled the appointment.
32. Fryar then sent another letter to plaintiff on January 17, 2003 acknowledging that he was still available for service. Fryar also indicated in his letter that if plaintiff remained motivated for vocational rehabilitation services, he should contact him as soon as possible.
33. On January 29, 2003 Defendants filed an I.C. Form 24 with the Industrial Commission, contending that plaintiff had repeatedly been non-compliant with the vocational rehabilitation and that defendants had made numerous efforts to settle this case to no avail. On March 5, 2003 the Industrial Commission issued an order ordering Plaintiff to fully comply with all reasonable medical and rehabilitation provided by defendants, including vocational rehabilitation.
34. On March 12, 2003, Fryar sent a letter to plaintiff notifying him that he had reopened his file to an active status and requested that plaintiff contact him. Plaintiff did contact Fryar as a result of this communication.
35. Ultimately, an initial vocational assessment was scheduled for April 3, 2003 in plaintiff's counsel's office. Fryar had received a letter from plaintiff's counsel confirming that a conference room would be available and reserved on April 3, 2003.
36. Fryar was able to locate suitable employment for plaintiff within a couple of months. The job that Fryar located for plaintiff was a position with a recycling center, Coastal Enterprises of Jacksonville ("Coastal Enterprises"). Coastal Enterprises specializes in assisting people with physical or mental disabilities back into the work force. They have military contracts throughout the community. They use the position at the recycling center as an evaluation for the job placement specialist to observe the new employee to make sure that the employee is able to take supervision, able to stay on task, and have the appropriate work tolerances. After the evaluation portion which typically lasts two or three months, depending on the employee's needs, the position is actually offered to the employee under contract. Another component about Coastal Enterprises is that it has other placements outside the recycling center with other contracts with positions that actually pay higher wages than the initial evaluation Recycle Production Specialist position.
37. Coastal Enterprises does not just employ those individuals who have some type of disability. Under their contract, 75% of the persons working under contract must have some form of physical or mental disability. The other 25% can come from the open labor market or just direct application. The position Fryar located for plaintiff at Coastal Enterprises is a Recycle Production Specialist. The responsibilities of that position include sorting through recycle products, placing recyclable products in different shoots, cleaning at the end of the day, and other light cleaning. Fryar also performed a job analysis for this position.
38. Plaintiff became aware of the position at Coastal Enterprises that Fryar had located for him in June of 2003.
39. Plaintiff was seen by Dr. Oh on June 24, 2003. At that time, it was decided that there were no further surgical recommendations and that plaintiff's condition was strictly pain management. Dr. Oh suggested that plaintiff establish a pain management physician closer to his home. Plaintiff was last seen by Dr. Oh on September 23, 2003. Plaintiff complained of slight worsening of his right knee pain. Plaintiff did not locate a treating physician closer to his home, and Dr. Oh informed him that he would not be continuing his pain medications by the end of the year.
40. Fryar met with the plaintiff again at his attorney's office on July 16, 2003 and discussed the position of Recycle Production Specialist at Coastal Enterprises. At that time, Fryar provided plaintiff with contact names. However, plaintiff did not contact anyone at Coastal Enterprises as suggested by Fryar.
41. Fryar received Dr. Garrett's approval of the position at Coastal Enterprises on September 9, 2003. At that point, Fryar sent the necessary information to Coastal Enterprises and subsequently received confirmation that plaintiff could have the Recycle Production Specialist position. By letter dated October 8, 2003, he notified plaintiff that Coastal Enterprises had accepted him and that Dr. Garrett had approved the position for eight hours a day. Fryar suggested in that letter that plaintiff contact Bill Hile of Coastal Enterprises to discuss the details of the job. However, plaintiff did not do so. Instead, plaintiff's counsel asked that the position be evaluated by Dr. Oh.
42. Dr. Oh reviewed the position at Coastal Enterprises, which had been previously reviewed and approved by Dr. Garrett for eight (8) hours a day. On November 14, 2003, Dr. Oh approved this position for plaintiff for six (6) hours a day. On November 19, 2003, plaintiff's attorney was informed of Dr. Oh's approval for plaintiff to perform this position at Coastal Enterprises. Following notice of Dr. Oh's approval of this position on November 19, 2003, Plaintiff continued his refusal to accept or even attempt this position at Coastal Enterprises.
43. On October 23, 2003, defendants sent plaintiff to William J. Albrecht, Jr., Ph.D. for an independent psychological evaluation. Dr. Albrecht found that plaintiff has a pain disorder associated with both psychological factors and a general medical condition. He also estimated that plaintiff's intellectual functioning falls within the low average to borderline range. Dr. Albrecht found that plaintiff's limited cognitive capabilities as well as premorbid personality style likely results in him experiencing an exacerbation of actual or perceived physical problems.
44. There is no mention of any right knee complaints in the medical records until plaintiff saw Dr. Rogers on January 19, 2001. Plaintiff had seen Dr. Green once and Dr. Difiore ten times over the eleven months that elapsed between the accident and the first reported complaint about his right knee. In addition, a review of the medical evidence in its entirety reveals that the competent medical evidence fails to causally relate any problem with plaintiff's right knee to the February 15, 2000 accident.
45. At the hearing, plaintiff denied having any back problems prior to February 15, 2000. However, a review of the medical evidence supports that plaintiff complained of low back pain during visits with his family physician, Dr. Edwin P. Little, in 1990, 1994, 1997, and 1999. Therefore, little to no weight is given to plaintiff's testimony that prior to February 15, 2000, he had had no back problems.
46. A review of the medical evidence in its entirety reveals no mention in the records of any back problems within a two-year period following plaintiff's compensable February 15, 2000 injury to his left knee. In addition, this review reveals that the competent medical evidence fails to causally relate any problem with plaintiff's back to the February 15, 2000 work accident.
47. The Recycle Production Specialist position at Coastal Enterprises is a legitimate job and it is not make-work. The position is available on the open job market. Coastal Enterprises uses the position as an entry-level job for new employees in order to evaluate for them for a full-time contract or placement in one of Coastal Enterprises other contracts with higher paying wages. While the initial wages plaintiff would earn at Coastal Enterprises would be less than what he was earning as a plumber for defendant-employer, he would be eligible to get wage increases every year and have the ability to move into higher paying jobs within his limitations at Coastal Enterprises.
48. There were seven medical depositions taken after the hearing, and five of those were at plaintiff's request. Two of the medical providers evaluated plaintiff from a psychological standpoint, and five evaluated him from a physical standpoint. All seven medical providers reviewed the on-site job analysis for the Recycle Production Specialist position at Coastal Enterprises, and all seven testified that plaintiff was capable of performing that position.
49. It is determined that the recycling position with Coastal Enterprises offered to plaintiff was suitable employment and that plaintiff was capable of performing this position. Plaintiff's continued refusal to accept this position or even attempt this position on or after November 19, 2003, is tantamount to an unjustifiable refusal of suitable employment.
50. Plaintiff has received permanent partial disability ratings to his left knee from a number of physicians.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff has failed to demonstrate by a preponderance of the evidence that his right knee condition is related to the injuries he sustained in his work-related accident on February 15, 2000. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has failed to demonstrate by a preponderance of the evidence that his back condition is related to the injuries he sustained in his work-related accident on February 15, 2000. N.C. Gen. Stat. §97-2(6).
3. Plaintiff has been made an offer of suitable employment. N.C. Gen. Stat. § 97-32.
4. Plaintiff has unjustifiably refused an offer of suitable employment, and, as such, defendants are entitled to a credit for all compensation paid between the time of notice to plaintiff of Dr. Oh's approval of the position, November 19, 2003, and continuing until plaintiff, in good faith, attempts to perform the Recycle Production Specialist position at Coastal Enterprises. N.C. Gen. Stat. § 97-32.
5. Plaintiff is entitled to have defendants provide all medical compensation necessitated by his February 15, 2000 compensable injury by accident, resulting in injury to plaintiff's left knee. N.C. Gen. Stat. § 97-25.
6. Plaintiff has received permanent partial disability ratings to his left knee from a number of physicians. N.C. Gen. Stat. § 97-31.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of his February 15, 2000 compensable left knee injury, so long as it tends to effect a cure and give relief or lessen plaintiff's period of disability.
2. Defendants are entitled to a credit for all temporary total disability benefits paid to plaintiff from November 19, 2003 and continuing until plaintiff, in good faith, attempts to perform the Recycle Production Specialist position at Coastal Enterprises.
3. Plaintiff's workers' compensation claims for his right knee and low back conditions are denied.
4. The issue of plaintiff's permanent partial disability to his left knee is to be determined by agreement of the parties or preserved for future hearing.
5. Defendants shall pay the costs.
This the 17th day of August, 2005.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
DISSENTING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER